## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| BENJAMIN HAWKINS, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil No. 08-139-P-S |
| | ) | |
| ROBERT KIELY, et al., | ) | |
| | ) | |
| Defendants | ) | |

### RECOMMENDED DECISION ON MOTION TO DISMISS

Defendants, Robert Kiely and Envirem Technologies, Inc. ("Envirem"), move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the instant complaint for failure to state a claim upon which relief can be granted. *See* Motion To Dismiss Plaintiffs' Second Amended Complaint ("Motion") (Docket No. 12) at 1-3. They argue, *inter alia*, that the defamatory statements that they are alleged to have made or published fall within the ambit of Maine's absolute privilege for statements by witnesses and, hence, are not actionable. *See id*. at 8-10. I agree and, accordingly, recommend that the Motion be granted.[1]

### I. Applicable Legal Standard

As the Supreme Court has clarified:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

---

[1] Jonathan Lee Riches, a would-be intervenor in this case, has taken an interlocutory appeal to the First Circuit of this court's decision to deny him intervenor status. *See* Notice of Appeal (Docket No. 20). The pendency of that appeal does not rob this court of jurisdiction to adjudicate the Motion, which has nothing to do with the matter raised in the appeal. *See Pharmaceutical Care Mgmt. Ass'n v. Maine Attorney Gen*., 332 F. Supp.2d 258, 259 (D. Me. 2004) ("[A]n appeal from either a final order or an interlocutory order made immediately appealable by statute divests a district court of authority to proceed with respect to any matter touching upon, or involved in, the appeal.") (citation and internal quotation marks omitted).

> recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted)[2]; *see also, e.g., Cook v. Gates*, 528 F.3d 42, 48 (1st Cir. 2008) ("To survive a motion to dismiss, a complaint must allege a plausible entitlement to relief.") (citations and internal quotation marks omitted).

"In ruling on a motion to dismiss [under Rule 12(b)(6)], a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Id*. "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (citation and internal quotation marks omitted); *see also, e.g., Arturet-Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 13 n.2 (1st Cir. 2005) (in ruling on motion to dismiss pursuant to Rule 12(b)(6), "[t]he court can consider, for instance, facts subject to judicial notice, implications from documents incorporated into the complaint, and concessions in the complainant's response to the motion to dismiss").

In this case, both sides draw the court's attention to official public records in the form of the docket sheet and filings from *In re Morse Bros., Inc.*, Case No. 05-21919 (Bankr. D. Me.)

---

[2] In so explaining, the Court explicitly backed away from the Rule 12(b)(6) standard articulated in *Conley v. Gibson*, 355 U.S. 41 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968 (quoting *Conley*, 355 U.S. at 45-46). The Court observed: "[A]fter puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 1969.

("*In re Morse*"). *See* Motion at 3-8 & exhibits thereto; Plaintiffs' Response to Defendants' Motion To Dismiss ("Response") (Docket No. 16) at 1-2, 6-8 & exhibits thereto. I have taken judicial notice of these materials.

## II. Factual Background

The Plaintiffs' Second Amended Complaint ("Complaint") (Docket No. 8), filed in response to my May 19, 2008, order directing them to provide a more definite statement of their claims, *see* Memorandum Decision and Order on Motion for More Definite Statement (Docket No. 7), alleges, in relevant part:

> 3. On or before January 20, 2006 Defendant Kiely, acting in the course and scope of his employment with Envirem, falsely stated to unknown persons within Envirem and to representatives of TD Banknorth that the Plaintiffs had conspired to fraudulently misrepresent to TD Banknorth the volume of inventory held by Morse Brothers, Inc. The precise dates the false statements were made are unknown, except that they must have been first made prior to January 20, 2006, since they were memorialized in an affidavit that was executed by Kiely on that date.
>
> 4. The affidavit containing the false statements was transmitted to TD Banknorth on an unknown date between January 20, 2006 and January 23, 2006.
>
> 5. The false statements made by Kiely on behalf of Envirem, of and concerning the Plaintiffs, were and are defamatory *per se*.
>
> 6. Kiely published within Envirem the false, defamatory statements described above, and Envirem then republished them to TD Banknorth, with malice, actual or implied.
>
> 7. Alternatively, Kiely published within Envirem the false, defamatory statements, and Envirem later republished them, negligently.
>
> 8. As a natural and foreseeable consequence of the Defendants' conduct, the affidavit containing the false, defamatory statements was filed in the United States Bankruptcy Court for the District of Maine, and is available via the Court's ECF system, thus portraying the Plaintiffs to the public in a false light that would be offensive to a reasonable person.
>
> 9. The false, defamatory statements published by Kiely and then republished by Envirem, and the publicity placing the Plaintiffs in a false light,

3

>     have caused and continue to cause actual damage to the Plaintiffs' reputations,
>     and have further caused the Plaintiffs to suffer pecuniary injury and severe
>     emotional distress.

Complaint ¶¶ 3-9.

On September 28, 2005, Morse Brothers, Incorporated ("Morse") of Auburn, Maine, filed a voluntary petition for chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Maine ("Bankruptcy Court"). *See* Docket No. 1, CM/ECF Docket Report, *In re Morse* ("Docket Report"), Exh. A to Motion (entry of Sept. 28, 2005).[3]  On the same day, Morse filed a motion to use cash collateral. *See* Docket No. 6, Docket Report (entry of Sept. 28, 2005).

The following day, T.D. Banknorth, N.A. ("Banknorth"), one of Morse's creditors, filed an objection to Morse's motion. *See* TD Banknorth's Objection to Debtor's Motion for Authority To Use Cash Collateral Pursuant to 11 U.S.C. §363(c)(2)(B), Fed. R. Bankr. P. 4001(b) and D. Me. LBR 4001-2, *In re Morse* ("Cash Collateral Objection"), Exh. B to Motion; *see also* Docket No. 16, Docket Report (entry of Sept. 29, 2005). Banknorth represented that it had loaned Morse money in the form of a line of a credit, which then had a principal balance of $4,332,181.24 and interest of $28,181.24, and a term note, which then had a principal balance of $289,140.14, and interest of $2,006.75. *See* Cash Collateral Objection at 1. In opposing Morse's motion, it asserted, *inter alia*:

>     The debtor recently approached Banknorth and announced that over an extended
>     period of time the debtor had miscalculated and misrepresented the value of its
>     inventory, that its inventory was worth substantially less (by more than
>     $1,000,000) than the debtor had been reporting to Banknorth, that Banknorth was
>     substantially undersecured[.]

*Id.* In later filings, Banknorth continued to raise concerns about Morse's management. These included:

---

[3] Various Morse subsidiaries filed chapter 11 at the same time as Morse, and their cases were consolidated with that of Morse.  *See* Motion at 4 n.1; Docket No. 51, Docket Report (entry of Oct. 13, 2005). For these purposes, it is sufficient to refer only to Morse.

1.	A motion filed on October 5, 2005, for an order authorizing examination of the debtor and requiring it to produce certain documents and tangible things, in which Banknorth stated: "A very substantial question exists whether the Debtor knows or has ever known the value or even the extent of its assets, including, in particular, its inventory.  Similarly, there is a very real question as to whether the Debtor has any idea concerning the prospects for its operation."  Motion of TD Banknorth, N.A. for Order Authorizing Rule 2004, Examination of the Debtor and Requiring the Debtor To Produce Certain Documents and Tangible Things, *In re Morse* ("Motion for Examination"), Exh. C to Motion, at 2; *see also* Docket No. 33, Docket Report (entry of Oct. 5, 2005).  Banknorth also represented that "over the last several weeks [Morse] provided Banknorth with wildly inconsistent reports concerning the value, exten[t] and amount if its accounts receivable and inventory" and that Morse had "explained that as of August 1, 2005 it had and knew that it had less inventory than the Debtor had previously represented because of erroneous calculations and representations concerning the physical quantity and value of its inventory."  Motion for Examination at 3.

2.	An emergency motion filed on October 14, 2005, for a finding of contempt and to compel Morse to produce documents, in which Banknorth complained, *inter alia*, "Although the debtor produced this morning for inspection by Banknorth records relating to its acquisition of inventory, the debtor provided virtually no documents concerning its measurement of inventory or its adjustments to its inventory."  Emergency Motion of TD Banknorth, N.A. for Finding of Contempt and Compelling the Debtor To Produce Documents, *In re Morse* ("Emergency Motion"), Exh. E to Motion, at 2; *see also* Docket No. 67, Docket Report (entry of Oct. 14, 2005).  In that motion, Banknorth observed that Morse had "represented to Banknorth and to this Honorable Court that its financial problems were the result of erroneous estimates concerning its

inventory; the debtor has represented that it has made inventory adjustments substantially in excess of $1,000,000.00." Emergency Motion at 2.

3. An objection filed on October 27, 2005, to a motion by Morse for authority to pay employees, in which Banknorth stated that "evidence developed during the 2004 Examination of the Debtor generates real question as to what work is being performed by management employees of the Debtor" and "it appears that the Debtor's handling of its financial matters, drawings on its line of credit with Banknorth and payment of pre- and post-filing expenses has been highly irregular and, at times, probably fraudulent." Objection of TD Banknorth, N.A., to Motion of Morse Brothers, Incorporated, for Authority To Pay Employees for Work Performed During the Week of October 17, 2005, *In re Morse* ("Pay Objection"), Exh. F to Motion, at 3; *see also* Docket No. 122, Docket Report (entry of Oct. 27, 2005). Banknorth alleged, *inter alia*: "After concluding that it and its affiliates had at least $2,000,000 less in working capital assets than they had previously represented to Banknorth, the Debtor decided to hide that fact from the Bank and draw as much money as possible against . . . its line of credit, even though the Debtor knew that the Bank was under-secured[.]" Pay Objection at 3.

4. An objection filed on November 15, 2005, to a motion by Morse and related debtor entities to sell their assets to Envirem, on grounds, *inter alia*, that during a court hearing regarding the proposed sale, Morse had made several "mistaken" representations to the court concerning the proposed sale of inventory; Banknorth did not have sufficient information regarding the quantity, cost, or value of the inventory to evaluate the adequacy of the proposed sale price; and Banknorth believed that it would not receive adequate protection. *See* Second Supplemental Objection of TD Banknorth, N.A., to Motion To Sell, *In re Morse* ("Envirem Sale Objection"), Exh. G to Motion, at 1-2; *see also* Docket No. 193, Docket Report (entry of Nov.

15, 2005).[4] In support of that objection, Banknorth alleged, *inter alia*: "It was clear from Mr. Cort's testimony at the 2004 Examination and it is clear from the records introduced at the hearing on the debtors' motion to use cash collateral that the debtors were not carrying their inventory at cost, but instead were routinely making quarter-end adjustments to 'book value' based on the owners' assertions concerning the value of inventory. Thus, for example, in September 2004, MBI [Morse], at the direction of its owner, wrote up the 'book value' of one category of its raw material inventory by several hundred thousand dollars. On the other hand, in the months leading up to the filing of the petitions in these cases, the debtors wrote down the value of their inventory by approximately Two Million Dollars." Envirem Sale Objection at 5.

An auction for sale of Morse's assets was held on December 15, 2005, attracting two bidders: Envirem and JWA Holdings, LLC ("JWA"). *See* Final Order Authorizing (1) Sale of Certain of the Debtors' Assets to Envirem Technologies, Inc., Free and Clear of Interests, Pursuant to 11 U.S.C. § 363; (2) Assumption and Assignment of Executory Contracts and (3) Other Relief in Aid of Consummation of Sale ("Envirem Sale Order") (Docket No. 262), *In re Morse*, ¶¶ 10-12. Both Envirem and JWA submitted higher and better offers than Envirem's original offer. *See id*. ¶ 12. Morse announced that it had selected the enhanced Envirem offer, which the court determined was the highest and best offer for the assets. *See id*. The sale was to close on January 15, 2006, or, if the deadline were extended, no later than January 31, 2006. *See* Transcript of Hearing on Motion To Expedite Hearing, Motion To Extend Closing Deadline, Motion To Amend Order, and Request for Status Conference re: Sale, *In re Morse* ("1/18/06 Transcript"), Exh. A to Response, at 65-66.

---

[4] On November 4, 2005, Morse filed a motion for, *inter alia*, approval of sale of certain of its assets to Envirem or to a higher bidder, free and clear of all liens, claims, and encumbrances. *See* Docket No. 161, Docket Report (entry of Nov. 4, 2005).

On January 13, 2006, Envirem filed a motion to extend the sale closing deadline to February 28, 2006. *See* Motion by Envirem Technologies, Inc. To Extend Closing Deadline to February 28, 2006, *In re Morse* ("Extension Motion"), Exh. H to Motion; see also Docket No. 273, Docket Report (entry of Jan. 13, 2006). At a hearing and status conference held on January 18, 2006, counsel for Morse opposed Envirem's request for an extension and apprised the court that his client had accepted a new and better offer from JWA, subject to court approval. *See* 1/18/06 Transcript at 8-10, 40-42. He argued that Envirem was in breach for failing to close on January 15, 2006, as contemplated by the parties' agreement and the court's order of sale, and that the debtors had made a business judgment to accept the JWA offer based, in part, on the performance of Envirem to date under the existing agreement, which they had found lacking in a number of respects. *See id*. at 42-43.[5] The court denied Envirem's motion for extension of the closing date, noting that Envirem had failed to close on January 15 and had conceded that it could not close by January 31. *See id*. at 64-66.

On January 19, 2006, Morse filed motions for authorization to sell its assets to JWA and for expedited hearing and shortening of notice requirements. *See* Docket Nos. 288-89, Docket Report (entries of Jan. 19, 2006). Envirem, Banknorth and others, including Wells Fargo Equipment Finance, Inc., and Androscoggin Valley Council of Governments, filed objections to the proposed sale to JWA. *See* Docket Nos. 292-93, 296, 299, Docket Report (entries of Jan. 20, 22-23, 2006). In its objection, Banknorth stated, *inter alia*:

> 4. Based on statements made in Court surrounding the hearings on Envirem's motion for an extension, TD Banknorth believes that before (and perhaps well before) actually reaching any contract to sell assets to JWA[,] the debtors may have had a contract (perhaps in writing) that they would negotiate only with JWA; if true, those facts are directly inconsistent with allegations in the motion that

---

[5] Morse's counsel made an offer of proof that there had been a significant accrual of administrative liabilities that had not been satisfied in a timely fashion by Envirem, including an obligation to Canadian National Railway Corporation ("Canadian National"). *See* 1/18/06 Transcript at 48.

> JWA had no greater access to the debtors and to relevant information than any other interested parties, including TD Banknorth; those facts are particularly troubling to TD Banknorth, which is the holder of approximately 70% of the unsecured claims in these matters;
>
> 5. TD Banknorth is informed and believes that the debtors' principals may have personal reasons to favor JWA over Envirem and that such considerations may have prevented the Debtors from negotiating with Envirem for commercially reasonable terms for an extension and modification of the Envirem APA [asset purchase agreement].

TD Banknorth's Objection to Debtors' Expedited Motion for Order Authorizing Sale to JWA, *In re Morse*, Exh. K to Motion, at 6; *see also* Docket No. 293, Docket Report (entry of Jan. 20, 2006).

On January 23, 2006, three affidavits were filed by Banknorth and docketed as being related to Morse's motion to sell its assets to JWA. *See* Docket Nos. 302-04, Docket Report (entries of Jan. 23, 2006). One was an affidavit of Robert T. Kiely dated January 20, 2006, in which Kiely stated that he was general manager of Envirem and that, as part of Envirem's effort to purchase Morse, he had conducted employment interviews, including an interview with Bruce Cort, Morse's chief financial officer. *See* Affidavit of Robert T. Kiely, *In re Morse* ("Kiely Affidavit"), Exh. L to Motion, at 1; *see also* Docket No. 304, Docket Report (entry of Jan. 23, 2006). He stated:

> Mr. Cort told me that, before the bankruptcy filing, at the direction of Ben Hawkins, he would regularly falsify the inventory records of Morse Brothers reported to TD Banknorth. He would overstate the amount of inventory on hand, at times by as much as $300,000 in a quarter. He said the intention was to disguise known losses in the company and correspondingly to overstate inventory for the borrowing base of TD Banknorth. He said these practices led to a total inventory overstatement of almost $4,000,000.

Kiely Affidavit ¶ 2. Kiely also addressed the subjects of (i) statements by truck drivers that not all of the cash they had collected for sale of Morse's products was put through Morse's books, and (ii) the status of Canadian National's relationship with Morse and Envirem. *See id*. ¶¶ 3-5.

9

A hearing was held on Morse's motions on the afternoon of January 23, 2006. *See* Transcript of Hearing Before the Hon. James B. Haines, Jr., *In re Morse* ("1/23/06 Transcript"), Exh. B to Response, at 3. At the outset, Judge Haines stated:

> Now, I've read the papers, including a flurry of affidavits filed in the last hour or so. And I want to make it very clear what we're here to do today and what we're not here to do today. We're not here to litigate issues about the disposition of the debtor's inventory in pre-bankruptcy operations. . . . We're not here to litigate whether or not Envirem wasn't in breach of the Court-ordered sale pursuant to the terms of that order because that was determined last week. Okay? So there's a whole lot of stuff in the affidavits that have to do with those things and, frankly, I won't say I couldn't care less because they may be important someday, sometime. They've got nothing to do with what we're here today for. Right now, the debtor is naked. It has no Court-approved offer for sale. It proposes to put forward today the JWA offer pursuant to the APA. . . . Basically, all we've got today is a request to consider the JWA offer and APA on an expedited basis. That's it. . . . Mr. Remmel's client [Envirem] feels that it should have had more time to close. That's fine. That's a feeling it can harbor and hold, but it was determined to be in breach and that deal was terminated, but no other deal has Court approval at this juncture.

*Id*. at 4-6. Judge Haines went on to say that, if the parties and counsel were unable to move forward, there was a "very simple solution":

> I will sua sponte convert this to Chapter 7 today because I'm through fooling around with this case. It's gotten ridiculous. This last flurry of affidavits is abusive and is meant to do nothing more than stir up anger, hostility and disputes about things that are either long past or simply don't count. This thing is gonna be preserved as a going concern and it's gonna get sold today or I'll make time to do it tomorrow. What I want – we don't need to let anybody –we don't need to invite anybody else to this party. It's Envirem-JWA.

*Id*. at 7. During the course of that day, Envirem made a revised offer for purchase of Morse's assets, and JWA modified its offer in such a manner as to win approval from all interested parties save Envirem. *See, e.g., id*. at 47-48, 50-51. With the concurrence of the Creditors' Committee, Morse accepted JWA's modified proposal. *See id*. at 47-49. Judge Haines indicated that, provided that changes to the form and substance of the proposed sale order were finalized that day, the debtor would be authorized to go forward with JWA. *See id*. at 52.

### III.  Discussion

The defendants seek dismissal of all claims asserted against them on two alternative grounds: that the statements at issue fall within the absolute privilege for witnesses, and that the plaintiffs failed to comply fully with the court's order that they provide a more definite statement of their claims.  *See* Motion at 8-11.  Alternatively, they assert that the applicable statute of limitations bars most of the claims against them.  *See id.* at 12-13.  I find the defendants' privilege argument dispositive and, hence, do not reach their alternative bases for full or partial dismissal of the claims against them.

As this court has recognized previously, "when considering a motion to dismiss a cause of action that is traditionally disfavored, such as defamation, courts tend to be more inclined to grant a motion to dismiss."  *Rohrbach v. Charbonneau*, No. Civ. 99-282-P-C, 2000 WL 760739, at *1 (D. Me. Mar. 1, 2000).  The affirmative defense of privilege may be "invoked as the ground for dismissal of a complaint which contains within its own confines allegations of sufficient facts to show the existence and applicability of a qualified privilege."  *See id.* at *1 n.1 (citation and internal quotation marks omitted).

Maine has adopted an absolute privilege for statements made by witnesses relating to judicial proceedings.  *See, e.g., id.* at *2 ("As with judicial immunity, witness immunity is a long-established legal principle" in Maine.  "To hold otherwise would tend to intimidate a witness and to deter from a disclosure of the whole truth.")  (citations and internal quotation marks omitted).  However, "despite its moniker, absolute immunity of this kind does have limitations."  *Id*.  These include "the requirement that to be covered by this absolute immunity, a statement must be related to the matter at issue before the judicial body."  *Id*.; *see also, e.g., Dineen v. Daughan*, 381 A.2d 663, 665 (Me. 1978) ("For the privilege to function as intended,

the statements it protects must be relevant to the judicial proceeding. The purpose of the privilege is to allow the attorney to litigate strenuously the interests of his client. To fulfill this purpose the privilege need only be broad enough to encompass statements relevant to those interests. To extend the protection beyond this point would be to abuse the public policy which acts as the underpinnings of the privilege.").

The plaintiffs seek to resist application of the privilege, and dismissal of their case, on grounds that (i) Maine follows the so-called "American rule" of witness privilege, pursuant to which the availability of an absolute privilege depends both on the testimony's relevance to the dispute regarding which it is offered and on the circumstances in which it is offered, (ii) Kiely's allegedly defamatory statements were not relevant to any dispute before the Bankruptcy Court, and (iii) because the Kiely Affidavit was volunteered and placed on the record without judicial invitation or approval, its proponents are entitled to no more than a qualified privilege, which the circumstances indicate they forfeited. *See* Response at 3-10.

In the plaintiffs' view, a fair interpretation of events giving rise to the instant action is that:

> [Envirem], frustrated at having contractually forfeited its opportunity to acquire the assets of [Morse], had its employee, Richard Kiely, execute an affidavit calculated to gratuitously smear [Morse], one of its owners (Plaintiff Hawkins) and one of its employees (Plaintiff Cort). That affidavit . . . was then filed with the Clerk of the United States Bankruptcy Court – unattached to any pleading or motion, and without the Court's invitation or any person having the opportunity to oppose its filing – at which point it became a matter of public record, available for review by anyone with access to the Court's electronic filing system. The Plaintiffs do not know how the affidavit got from Envirem to [Banknorth], or why anyone thought it might conceivably be relevant to any issue before the Bankruptcy Court; they speculate, however, that Envirem, in exchange for providing the bank with ammunition against [Morse], in the form of bogus accusations of fraudulent and potentially criminal conduct, hoped [Banknorth] would support it if a new opportunity to purchase [Morse's] assets came to pass.

*Id*. at 2.

### A.  Relevance of Statements to Judicial Proceeding

As a threshold matter, the plaintiffs contend that Kiely's statements were not relevant to *In re Morse* because:

1. On January 23, 2006, when the Kiely Affidavit was filed, Envirem had no rightful role in the bankruptcy case. *See id.* at 6. Envirem at that time was not a creditor, had no viable bid, and had no stake in the outcome of the proceeding. *See id.*

2. Judge Haines made it unmistakably clear that he did not regard the substance of the affidavit as relevant, going so far as to characterize the last-minute affidavits as "abusive and . . . meant to do nothing more than stir up anger, hostility and disputes about things that are either long past or simply don't count." *Id.* at 8 (quoting 1/23/06 Transcript at 7).

The plaintiffs conclude: "This, therefore, is precisely the case that *Dineen* envisioned – one where a party makes in court a false, defamatory statement that has *nothing to do* with the proceeding in connection with which it is offered." *Id.* (emphasis in original).

The plaintiffs miss the mark in arguing that Envirem had no rightful role in the Morse bankruptcy case as of January 23, 2006. The Docket Report indicates that the Kiely Affidavit was filed by Banknorth, not Envirem. For purposes of the statements made in the affidavit, Kiely hence functioned as Banknorth's witness. Banknorth, which had extended more than $4 million in credit to Morse, was a major creditor with a clear interest in any proposed sale of Morse's assets. In any event, even assuming *arguendo* that Kiely was Envirem's witness, Judge Haines permitted its counsel to participate fully in the hearing held on January 23, 2006. *See, e.g.*, 1/23/06 Transcript at 7, 12, 16, 23-25, 44-48, 51-52.

Turning to Judge Haines' comments, they can indeed reasonably be construed to indicate that he found the Kiely Affidavit irrelevant to the issues before him on January 23, 2006.

However, the witness privilege is not undermined because a witness's statements are irrelevant to a specific hearing or point in controversy, or unresponsive to a particular question. Rather, "[a] witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding." Restatement (Second) of Torts § 588 (1977). "Testimony to be privileged need not be material or relevant to the issues before the court, nor does the fact that the testimony is offered voluntarily and not in response to a question prevent it from being privileged if it has some reference to the subject of the litigation." *Id*. cmt. c; *see also, e.g., Dineen*, 381 A.2d at 665 (motion containing allegedly defamatory statements was sufficiently related to the underlying cause of action for purposes of invocation of the privilege when, although the motion, filed by the defendant-debtor to seek the return of improperly attached goods, did not address the question presented in the underlying cause of action, whether a debt was due and owing to the plaintiff-creditor, the need for it arose from the underlying action; observing, "[t]he relevancy of the statements required by the privilege need not be so narrowly construed"); *Creamer v. Danks*, 700 F. Supp. 1169, 1172 & n.4 (D. Me.), *aff'd*, 863 F.2d 1037 (1st Cir. 1988) (noting that the Law Court applies Restatement principles in slander actions raising questions of privileges; observing, "The holding in *Dineen* is supported by Restatement principles which recognize a broad standard of relevance; it is not necessary that the defamatory matter be relevant or material to any issue before the court but only that it have some reference to the subject of inquiry.") (citations and internal punctuation omitted).

The defendants' allegedly defamatory statements meet the test of having some reference to the subject of the underlying litigation. Morse experienced financial difficulties sufficient to

cause it to file for chapter 11 bankruptcy protection. Following that filing, Banknorth, one of Morse's largest creditors, continually expressed concerns that Morse's management had jeopardized the bank's interests prior to its chapter 11 filing, and was continuing to do so post-filing, by mismanagement and even deliberate misrepresentation of the value of the bank's collateral (Morse's inventory). Banknorth opposed motions by Morse for authority to use cash collateral, to pay employees, and ultimately to sell its assets, first to Envirem and then to JWA, in part on the basis of those concerns. In objecting to the JWA transaction, Banknorth again expressed distrust of and concern over the conduct of Morse's management, suggesting that management had personal reasons to secretly court JWA and to spurn what Banknorth then viewed as the better offer by Envirem, to the detriment of Banknorth. The statements memorialized in the Kiely affidavit sounded similar themes. While the statements proved irrelevant to Judge Haines' decision to authorize the sale of Morse's assets to JWA, they were relevant to the larger judicial proceeding.[6]

### B. Level of Privilege for Volunteered Statements

The plaintiffs argue that the defendants' statements not only were irrelevant to any dispute before the Bankruptcy Court but also merit lesser protection because of the circumstances in which they were injected into the proceeding. *See* Response at 3-6, 9-10. They contend that the defendants maliciously volunteered the Kiely Affidavit, which was filed in a "highly irregular" manner, unattached to any pleading or motion, without the court's invitation,

---

[6] The plaintiffs do not argue that any privilege that attached to Kiely's statements was lost by unnecessary or unreasonable publication. *See generally* Response. The Complaint alleges only publication to unknown persons within Envirem and to Banknorth, which then published the statements by filing the Kiely Affidavit via CM/ECF in the *In re Morse* matter. *See generally* Complaint. These transmissions are reasonably related to the filing of the Kiely Affidavit as part of the *In re Morse* proceeding. *Compare, e.g., Vahlsing Christina Corp. v. Stanley*, 487 A.2d 264, 267 (Me. 1985) ("The plaintiff's complaint alleges use of the statements beyond the New Jersey proceedings, . . . averring the defendant distributed and disseminated the statements in Texas, New Jersey, and Maine. The privilege may well have been lost by unnecessary or unreasonable publication beyond the scope of the privileged circumstances.").

and without an opportunity for anyone to oppose its filing. *See id.* at 2-3. They conclude that "the manner in which the Kiely Affidavit was presented casts doubt on whether these Defendants should benefit *at all* from the privilege afforded litigants and witnesses." *Id.* at 10 (emphasis in original).

The plaintiffs cite *Johnson v. Dover*, 143 S.W.2d 1112 (Ark. 1940), and *Weil v. Lynds*, 185 P. 51 (Kan. 1919), for the proposition that a witness may be entitled to differing levels of immunity depending on whether a statement is elicited or volunteered. *See id.* at 4-6; *see also, e.g., Dover*, 143 S.W.2d at 1113 ("[A witness's] immunity is more extensive where the statement is in answer to a question than where he volunteers it. . . . The privilege of a witness may extend to a voluntary statement. He is entitled to absolute privilege with respect to it if it is in fact pertinent to the issues being tried; otherwise he enjoys but a qualified privilege depending upon whether or not he acted with actual malice.") (citation and internal quotation marks omitted); *Weil*, 185 P. at 52 ("Where a witness while on the stand makes a 'voluntary statement' – one not given in reply to a question asked him – he is entitled to absolute privilege with respect to it, and regardless of his motives cannot be held to answer for it in an action for slander, if in fact it is pertinent to the issue being tried; otherwise he enjoys but a qualified privilege, depending upon whether or not he acted in good faith and believed the matter to be pertinent as well as true.").

The plaintiffs argue that in *Barnes v. McCrate*, 32 Me. 442 (1851), the Law Court implicitly recognized the distinction between volunteered and elicited statements in holding that a witness enjoys an absolute privilege "when called upon, in the progress of a cause, and under the rules of the court, and confining himself to that which rightfully pertains to the case[.]" Response at 4, 6 (quoting *Barnes*).

The defendants rejoin, *inter alia*, that the plaintiffs rely on inapplicable citations from early 1900s caselaw from other jurisdictions, and that the law in Maine is that witnesses enjoy an absolute privilege if their statements relate to litigation. *See* Defendants' Reply Memorandum in Support of Their Motion To Dismiss ("Reply") (Docket No. 19) at 1-3.

Even assuming *arguendo* that the Law Court subscribed to the views expressed in *Dover* and *Weil*, the outcome in this case would be the same. As noted above, I have determined that the statements at issue were related to the proceedings in *In re Morse*. Both *Dover* and *Weil* recognize that, even as to voluntary statements, a witness's privilege is absolute if those statements are pertinent to the issues being tried. *See Dover*, 143 S.W.2d at 1113; *Weil*, 185 P. at 52.

In any event, in the century and a half since *Barnes* was decided, the Law Court never has indicated that the absolute witness privilege is limited, or that only a qualified privilege applies, if statements are volunteered rather than elicited.[7] Rather, Maine courts have continued to describe the privilege as "absolute," subject to the limitations that "[t]he statements must be relevant or pertinent to the proceedings" and that there is no "unnecessary or unreasonable publication beyond the scope of the privileged circumstances." *Smith v. Idexx Labs., Inc.*, No. CIV.A. CV-99-493, 2000 WL 33675700, at *1 (Me. Super. Ct. Jan. 11, 2000) (citations and internal quotation marks omitted); *see also, e.g., Raymond v. Lyden*, 1999 ME 59, ¶ 6; 728 A.2d 124, 126 ("A party to a private litigation is privileged to publish slanderous material concerning the title of another in the institution of a judicial proceeding in which he participates, if the matter has some relation to the proceeding. The privilege is absolute and protects a party to a private litigation from liability irrespective of his purpose in publishing the defamatory matter, of

---

[7] "A qualified privilege is dissipated as a protection to one who, in exercising it, acts with malice in fact – an actual purpose or design to cause injury to the plaintiff[.]" *Cohen v. Bowdoin*, 288 A.2d 106, 112 (Me. 1972).

his belief in its truth or even his knowledge of its falsity.") (citations and internal punctuation omitted); *Dineen*, 381 A.2d at 664-65 (recognizing absolute privilege when witness statements are relevant to judicial proceeding). The plaintiffs accordingly fail to make a persuasive case that Maine recognizes a lesser level of protection for witness statements when those utterances are volunteered rather than elicited in response to questioning.[8]

In short, it is clear from the face of the Complaint, combined with the Docket Report and relevant pleadings from *In re Morse*, that the statements made and/or published by the defendants about which the plaintiffs complain are absolutely privileged. The defendants' motion to dismiss accordingly should be granted.[9]

### IV. Conclusion

For the foregoing reasons, I recommend that the defendants' motion to dismiss the plaintiffs' second amended complaint be **GRANTED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

---

[8] Nor do the plaintiffs gain traction in arguing that the circumstances of the filing were irregular. The Kiely Affidavit was docketed as having been filed by Banknorth in opposition to Morse's motion to sell its assets to JWA. The Federal Rules of Bankruptcy Procedure do not require "opposing affidavits" to be filed with opposing memoranda and do not require advance permission of the court before their filing. *See* Fed. R. Bankr. P. 9006(d).

[9] In their Response, the plaintiffs describe their Complaint as raising a claim for intentional infliction of emotional distress as well as a claim for defamation. *See* Response at 12. As the First Circuit has observed, "the absolute privilege for statements made in the course of judicial proceedings bars not only plaintiffs' defamation claim, but *all* the causes of action alleged against defendant[.]" *Creamer*, 863 F.2d at 1037 (emphasis in original).

*Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.*

Dated this 31st day of August, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge
